J-S36037-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| ROBERT L. KEYES | : | |
| | : | |
| Appellant | : | No. 754 MDA 2024 |

Appeal from the Judgment of Sentence Entered May 17, 2024
In the Court of Common Pleas of Union County Criminal Division at
No(s):  CP-60-CR-0000077-2023

BEFORE:  LAZARUS, P.J., McLAUGHLIN, J., and BENDER, P.J.E.

MEMORANDUM BY BENDER, P.J.E.:     **FILED: NOVEMBER 21, 2024**

Robert L. Keyes ("Appellant") appeals from the judgment of sentence of 50 to 108 months of incarceration, presenting three inter-related challenges to the trial court's determination that he forfeited his right to counsel by his dilatory conduct.  Appellant seeks a new trial.  We affirm.

We note that Appellant was convicted, following a jury trial, of one count each of these misdemeanor offenses: Driving Under the Influence (DUI): General Impairment (75 Pa.C.S. § 3802(A)(1)), Flight to Avoid Apprehension (18 Pa.C.S. § 5126(a)), and Resisting Arrest (18 Pa.C.S. § 5104).  The trial court also convicted Appellant of seven summary Vehicle Code violations.[1]

---

[1] The summary convictions were for Disregarding Traffic Lanes (75 Pa.C.S. § 3309(1)), Driving at a Safe Speed (75 Pa.C.S. § 3361), Displaying an Unauthorized Certificate of Inspection (75 Pa.C.S. § 4703(E)), Accidental Damage to an Unattended Vehicle (75 Pa.C.S. § 3745(A)), Failure to Notify Police of an Accident (75 Pa.C.S. § 3746(A)(2)), Careless Driving (75 Pa.C.S. § 3714(A)), and Reckless Driving (75 Pa.C.S. § 3736(A)).

These charges arose from a "single vehicle crash into the concrete median of US-15 northbound" On March 3, 2023.  N.T., 11/30/23, at 74-5.  Pennsylvania State Trooper Dustin Spangler explained:

> When I got on scene, I observed vehicles able to safely negotiate around the crashed vehicle.  I observed fire and EMS already on scene.  I observed a silver Hyundai Elantra parked against the median.
>
> ***
>
> I observed significant front-end damage[,] and I observed the front driver's side wheel to be torn off.  The vehicle could not be moved under its own power at that point.
>
> I was informed upon arriving on scene from the fire chief that there was no operator inside the vehicle.  However, while en route to the crash location, I was provided the description of an African American male with a Chicago Bull's hat.

*Id.* at 77-78.  As Trooper Spangler and his partner looked for the operator of the crashed vehicle, or the man in the Chicago Bull's hat, they came upon a Sunoco station.  *Id.* at 80.  Trooper Spangler noticed a man leaving the Sunoco who looked as if he had been walking in the inclement weather and briefly attempted to question him, but the man left.  *Id.* at 81-82.  After a search of the surrounding area, Appellant was found lying in a puddle underneath the trailer of a commercial vehicle.  *Id.* at 83.

Trooper Spangler testified that it took "substantial force" to gain control over Appellant while attempting to remove him from under the trailer.  *Id.* at 86.  Appellant appeared dazed and had a "moderate" odor of alcohol around him, and he refused any blood test.  *Id.* at 88-92.  The trooper then transported Appellant to the state police barracks and, while typing up the

complaint, Appellant told the trooper that the vehicle malfunctioned while he was driving, causing the crash. *Id.* at 93.

Following his arrest, Appellant was represented by Brian Ulmer, Esquire, the Public Defender of Union County. After a pre-trial conference, Attorney Ulmer filed a motion seeking the appointment of conflict counsel. While neither the motion, nor the notes of testimony from this hearing, are included in the certified record, the trial court informs us that the basis for the motion was that Appellant averred that Attorney Ulmer was ineffective. Trial Court Opinion (TCO), 6/28/24, at unnumbered page 1. The motion to withdraw was granted, and the trial court appointed Michael Sullivan, Esquire, to represent Appellant.

Attorney Sullivan participated with Appellant during jury selection on October 30, 2023. However, on November 20, 2023, Attorney Sullivan filed a motion to withdraw his appearance in this case, explaining that he had attempted to meet with Appellant to discuss the case and prepare for trial, but Appellant refused to meet with him, refused to discuss his case, and refused to assist in preparation of his defense. *Id.* at 1-2. The trial court scheduled a hearing on the motion to withdraw, arranging for it to occur immediately prior to Appellant's trial. Following the hearing, the trial court granted the motion to withdraw, and further found that Appellant had waived his right to standby counsel. N.T. at 48. During the subsequent trial, Appellant represented himself and was convicted of all charges.

Prior to sentencing, Appellant obtained private counsel who filed a post-trial motion seeking a new trial based upon the improper denial of counsel at trial.[2]  The motion was denied after a hearing on March 26, 2024.  Appellant was ultimately sentenced on May 17, 2024, to an aggregate term of 50 to 108 months of incarceration.  Appellant timely filed a notice of appeal.[3]

Appellant raises the following issues in this appeal:

(1)  Did the trial court abuse its discretion and/or commit an error of law by … finding that good cause existed to allow Appellant's then court-appointed legal counsel … leave to withdraw on the morning of Appellant's trial?

(2)  Did the trial court abuse its discretion and/or commit an error of law in finding that Appellant forfeited his right to counsel?

(3)  Did the trial court abuse its discretion and/or commit an error of law in forcing Appellant to proceed to trial *pro se* without any time to prepare?

Brief of Appellant at 4.  As all of Appellant's issues involve elements of the trial court's determination that he forfeited his right to counsel, we examine them together.  Appellate review of an issue regarding an alleged denial of the constitutional right to counsel is a question of law for which our standard of review is *de novo* and our scope of review is plenary.  ***Commonwealth v. McClendon***, 293 A.3d 658, 666 (Pa. Super. 2023).

Initially, we note that the Sixth Amendment to the United States Constitution and Article I, Section 9 of the Pennsylvania Constitution

---

[2] This motion is also not included in the certified record of this case.

[3] No post-sentence motions were filed.  The trial court did not order Appellant to file a Pa.R.A.P. 1925(b) statement of errors complained of on appeal.

guarantee a criminal defendant the right to the assistance of counsel. "However, the constitutional right to counsel of one's own choice is not absolute." ***Commonwealth v. Lucarelli***, 971 A.2d 1173, 1178 (Pa. 2009).

> Rather, the right of an accused individual to choose his or her own counsel, as well as a lawyer's right to choose his or her clients, must be weighed against and may be reasonably restricted by the state's interest in the swift and efficient administration of criminal justice. Thus, while defendants are entitled to choose their own counsel, they should not be permitted to unreasonably delay the state's efforts to effectively administer justice.

***Id.*** at 1178-79.

There is an important distinction between the waiver of counsel and forfeiture of counsel when addressing a criminal defendant's dilatory tactics at trial. Waiver is defined as an intentional and voluntary relinquishment of a known right. ***Id.*** at 1179. Forfeiture, on the other hand, does not require that the defendant intend to relinquish a right; rather, the right may be lost because of "extremely serious misconduct" or "extremely dilatory conduct." ***Id.*** To determine, then, whether the trial court properly deemed Appellant to have forfeited his right to counsel, we must carefully evaluate the record.

Immediately before trial was scheduled to begin in this case, the trial court conducted a hearing on the motion to withdraw filed by Appellant's then-counsel, Attorney Sullivan, and we glean Appellant's history with his attorneys from this transcript. Attorney Sullivan told the trial court that he "did not bring [his] motion lightly[,]" but that there had been an irretrievable breakdown in communication with Appellant in the time between picking the jury and the first day of trial. N.T. at 4. Attorney Sullivan had been appointed

to represent Appellant after prior counsel had been permitted to withdraw due to Appellant's allegations of ineffectiveness. *Id.* at 5.

In explaining why counsel felt that he had to withdraw so close to trial, Attorney Sullivan obliquely explained:

> On November 15th, I met with [Appellant]. He made statements that are at the very least troubling and at worst put me in a position where I may not be able to take certain actions in this case today. Those are of his doing not mine.
>
> I am constrained as to the nature of the comments made by [Appellant]. My reaction was to give him a day or two of cooling off to speak with him again. Which I did do on the 17th of November, at which time [Appellant] once again made statements that were troubling to me as well as refused to speak further. He refused to meet with me. He refused to aid me in his defense. … Without the aid of [Appellant], I was constrained to do my best and submit no exhibits that were known and potentially just [Appellant] as a witness, to be determined at trial.
>
> I've also had to prepare for [trial] today without his benefit as to his desires in the case and his information relative to the facts of the case. This has prejudiced my ability to effectively represent [Appellant].
>
> Again, I can't divulge the nature of his comments. They've led me to an inescapable conclusion I cannot effectively represent him today.

*Id.* at 6-7. The trial court asked Appellant for his input on counsel's motion. Appellant stated that the relationship with counsel broke down because, during the jury selection which had occurred a few weeks earlier, he saw a witness list for trial which did not include Trooper Spangler, the affiant in the case. *Id.* at 11. Appellant inferred from this that he was being denied the right to confront his accusers, which he contended was his attorney's fault.

*Id.* However, the trooper was present and ready to testify at Appellant's trial. *Id.*

As for making troubling statements to Attorney Sullivan, Appellant did not indicate the substance of the disquieting conversation, stating only, "I mean[,] it may have been troubling to him but it was troubling to me, too, not being able to confront my accuser and sitting here for nine months for a DUI that should never have been charged." *Id.* at 13. Appellant did not divulge the nature of the "troubling" statements further, and he refused to waive the attorney/client privilege to permit counsel to discuss the conversation. The court then began discussing whether to appoint Attorney Sullivan as standby counsel. *Id.* at 15-16. Attorney Sullivan was not opposed to acting as standby counsel. *Id.* at 15. Appellant interrupted the discussion:

> [APPELLANT]: I'm going to stop you right now. I'm just going to remain silent in these proceedings because I'm not a counselor.
>
> THE COURT: I understand.
>
> [APPELLANT]: I'm not an attorney and I'm not going to sit here and represent myself even with standby counsel.

*Id.* at 16. The trial court patiently explained:

> THE COURT: Well, let's get to that then. You've chosen for -- well, what I've heard from [Attorney] Sullivan is there's a breakdown in communication and that on at least two occasions in attempting to prepare for this trial, you either refused to meet with him or refused to discuss the case.
>
> In any event, [Attorney] Sullivan has told me that the effect has been that you decline to work with him in preparing your defense. That's what he's told me. Do you want to respond to that in any way?

- 7 -

Because here's the thing. If that's true, and I accept that as true, then you forfeited your right to have an attorney and we're going to go forward today, and you can either represent yourself or you can have [Attorney] Sullivan as standby counsel.

[APPELLANT]: No. What is true is that he tried to get me to not have an accuser. That's the part that broke down. So[,] if he wants to represent the case, he can represent the case as far as I'm concerned. Now, if you want to deny me counsel, then that's your right.

THE COURT: Oh, no. I'm not going to deny you counsel, sir. That's not for me to do.

[APPELLANT]: I'm not representing myself, and I think I deserve adequate representation of somebody who's going to come in here and fight the case as if -- as his job he's appointed to do.

So[,] I'm not like going to sit here and represent myself because I don't know the intricacies what's going on here. I'm not an attorney. And I'm not -- and I understand these are misdemeanors, but I understand one thing that there was no evidence to even charge me with anything and there was no evidence for the charge to even be filed. Whenever the DA signed off on it, I don't know what they was [*sic*] thinking because there was nothing there.

THE COURT: Well, that's why we're here.

[APPELLANT]: So[,] I'm not going to put myself out there to represent myself. So[,] I'm just going to invoke my Fifth Amendment right to remain silent at this point because I'm done with it.

THE COURT: Well, you absolutely have the Fifth Amendment right.

[APPELLANT]: I'm done with it. I'm not even supposed to be here, sir, as far as I'm concerned in my own right. I mean I didn't do anything wrong. I was approached outside whatever he's claiming. He never saw me do anything wrong. So[,] I'm not -- I'm just done with the proceeding. … [Y]ou guys do as you guys see fit.

*Id.* at 16-18.

- 8 -

The court specifically asked Appellant to explain why he declined to assist in preparation of his own defense, to which Appellant responded:

I'm not going to assist him in prosecuting myself[,] which is what he was trying to get me to do. He was trying to get me to prosecute myself.

Just like [Attorney] Ulmer was trying to get me to stipulate at the preliminary hearing, him and [the prosecutor]. They asked me to stipulate at a hearing to find a *prima facie* case against myself[,] so I knew right then there was a breakdown in everything because I had no representation.

And then he [came] in and ask me to allow Trooper Phillips to sit in for Trooper Spangler.[4] Who does that? What kind of court does that? What kind of lawyer does that?

*Id.* at 19. The court continued to explore why Appellant refused to work with his attorneys, explaining the use of stipulations in court, and how the troopers' names on the witness list were not really relevant. *Id.* at 19-22. The court informed Appellant, "[t]here's consequences for you shutting down in talking with your attorney[.]" *Id.* at 22. The court further explained:

And the consequences are that you forfeited your right to have Attorney Sullivan represent you as an attorney. I will appoint him as standby.

But this is your last opportunity to tell me anything else you want me to know because the information I have before me right now leads me to the conclusion that you forfeited your right to be represented by an attorney because one was appointed for you and without a good reason, you basically shut down

---

[4] It appears that the essence of this complaint is that, since the affiant was not on the witness list during jury selection, Appellant believed that he would not be testifying at his trial, and the affiant's partner, Trooper Kyle Phillips, would be the sole Commonwealth witness. Appellant's issue is that Trooper Phillips was not the affiant, did not sign the complaint, and was not his 'accuser.' In fact, both troopers testified at Appellant's trial.

communications with him and he could not effectively prepare. That's what I have in front of me right now.

Is there anything else you want to say?

*Id.* at 23.  As Appellant continued to complain that Trooper Spangler had not been on the witness list, the court informed him, "the rules are that [witnesses] have to be disclosed through the discovery process.  And Trooper Spangler was clearly disclosed[.]  … The reality is that let's say God forbid Trooper Spangler got hit by a bus a week ago.  … This trial could go forward because Trooper Phillips was there and allegedly saw everything that happened."  *Id.* at 24-25.  Again, Appellant responded:

> [APPELLANT]:  I am not representing myself.  I'm not an attorney.  I'm not doing that.  I'm not doing any of that.
>
> THE COURT:  I don't know what that means that you're not doing any of that.
>
> [APPELLANT]:  I'm not representing myself.  I'm not doing it.
>
> THE COURT:  Well, tell me more what that means in your world.
>
> [APPELLANT]:  It means that I'm not going to sit here and try to talk to a jury and explain to them what took place on March 3rd.

*Id.* at 27.  The court then explained that the Commonwealth must prove its case beyond a reasonable doubt, and that it had the ultimate burden of proof. *Id.* at 27-28.  After some discussion with the prosecutor, and informing the parties that a juror had a medical issue and would have to be replaced by an alternate, the court asked Appellant if he understood what had happened with the juror, and whether he wanted Attorney Sullivan to represent him in a standby capacity.  *Id.* at 35.  In response, Appellant replied:

> [APPELLANT]:  I mean I guess you guys made your all decision on what you all going to do.

- 10 -

THE COURT:  No, no, no.  Now, wait a minute.

[APPELLANT]:  I'm going to be silent.  You guys do whatever it is you want to do, I'm going to remain silent, and I'll just appeal it later.  I'm going to remain silent and I'm going to let you guys do whatever it is you guys [are] doing here, and I'm done with the situation.

THE COURT:  You have agency.  For you to rollover and say I don't care.  You guys are going to do –

[APPELLANT]:  I don't care.

THE COURT:  But I'm asking you for a reason.  I'm asking you for a reason.

[APPELLANT]:  Sir, I don't mean to be disrespectful.

THE COURT:  I don't think you're being disrespectful.

[APPELLANT]:  But my life and my freedom has been at hand here, at stake here.  And I'm not going to sit here and try to represent myself.  I'm not going to do any of those things.  I'm just going to wait until these proceeding are over.  You guys do whatever it is you plan to do here, and we'll take it from there.

THE COURT:  As you wish.

[APPELLANT]:  To some court, appellate court, whatever we got to do.  But I'm not going to sit here and say that I'm an attorney.  I'm not.  I'm not - - I don't care.  I don't know what the standby counsel.  I don't know none of that.  I don't have time for none of that.  I don't understand any of that.  So[,] I'm not going to.

THE COURT:  I can tell you're frustrated.  Okay.  And I get it.

[APPELLANT]:  I'm just done.  I've been sitting here for ten months - - nine months now as it is.  I mean let's do what you're going to do.  You all have your trial.  Because I'm going to be sitting here.  And I'm not going to sit here and act like I'm counsel[,] even with standby counsel.

It's all rigged.  It's all rigged against me.  So[,] I'm not going to sit here and sit here and try to act like I'm an attorney or represent myself on anything.

***

- 11 -

All I know is I was picked up, threw [*sic*] in the back of a squad car, and charged with DUI and flight from apprehension and resisting arrest. And I asked where's the evidence?

\*\*\*

I didn't do anything wrong that night other than try to be safe and keep myself safe. That's what I was doing.

\*\*\*

I'm not telling the jury anything. I mean that's you guys. You guys said I have to represent myself with standby counsel. I'm not an attorney.

\*\*\*

I'm done with the conversation, sir.

*Id.* at 36-39.

Appellant continued to complain that he was not an attorney and did not understand the proceedings. *Id.* at 40. When Appellant stated that he did not understand, the trial court asked Appellant what questions he had about the proceedings or what explanations he required. *Id.* At one point, Appellant stated that he did not understand what was happening, "[p]lus I got mental issues." *Id.* at 41.[5] Appellant maintained that he did not understand the proceedings at least nine times in the space of a few minutes, but declined to be specific or ask pertinent questions of the court. *Id.* at 40-42. The court eventually stated:

> We've been here for a while now and **none of that rings true to me.** … Frankly, I'm getting a flavor of what [Attorney] Sullivan was describing as a breakdown in communication because I'm having a breakdown in

---

[5] Appellant briefly alleged he suffers from post-traumatic stress disorder (PTSD). N.T. at 41. Appellant did not indicate at trial how that diagnosis was in any way relevant to the proceedings, nor does he do so now.

- 12 -

communication. You keep telling me you don't understand what's going on but you absolutely refuse to ask me a single question so I can help explain it[,] which leads me to conclude you don't want to ask any questions because you don't want to understand.

*Id.* at 42-43 (emphasis added). When Appellant continued to complain that he would not prosecute himself, and reiterated that he did not understand anything, even after the court accused him of stonewalling, the court asked again whether Appellant wanted standby counsel. *Id.* at 43-46. At that point, Appellant stared at the wall and refused to engage with the court further. *Id.* at 47. Due to Appellant's silence when the court asked him if he wanted Attorney Sullivan as standby counsel, the trial court concluded that Appellant waived standby counsel. *Id.* at 48. Eventually, the jury was brought into the room and trial started, with Appellant representing himself.

We recognize that the forfeiture of counsel is a very serious matter. Further, neither the United States Supreme Court nor the Pennsylvania Supreme Court have expressly stated either the quantity or quality of misconducts by a defendant that would support a ruling that a defendant has forfeited his or her right to counsel. We thus look to precedent for guidance.

In *Lucarelli*, *supra*, our Supreme Court found forfeiture of the right to counsel appropriate where the defendant, over a period of 8½ months, had hired several attorneys who were each permitted to withdraw, refused to be represented by the public defender's office, filed multiple *pro se* motions while being represented by court-appointed counsel, and showed up for trial without representation. When Lucarelli stated at a hearing in which he appeared *pro*

- 13 -

*se* that he was without money to hire counsel, the trial court lowered his bond by $20,000 so that he would have sufficient funds. **Lucarelli**, 971 A.3d at 1177. Despite this, he still arrived for his trial on the next date without an attorney, stating that he would not give his money to a "bank robber" like his former counsel. **Id.** The Supreme Court found that Lucarelli's "pattern of behavior constituted extremely dilatory conduct, sufficient to result in the forfeiture of his right to counsel." **Id.** at 1180.

In addition, in 2010, this Court considered the issue of forfeiture of counsel in **Commonwealth v. Kelly**, 5 A.3d 370 (Pa. Super. 2010). There, Kelly was charged with DUI and entered a guilty plea. **Id.** at 371-72. Kelly was represented by counsel during his guilty plea, and the trial court scheduled a sentencing hearing. **Id.** at 372. Kelly then filed a *pro se* post-sentence motion seeking work release, which was denied because Kelly was represented by counsel and awaiting sentencing. **Id.** Kelly then filed a *pro se* motion to withdraw his plea, arguing that counsel had been ineffective for failing to recognize a defective affidavit of probable cause. **Id.** The court conducted a hearing on the motion to withdraw his plea at which Kelly appeared *pro se,* with a public defender attorney acting in a standby capacity. **Id.** The court granted the motion to withdraw and ordered Kelly to proceed with the public defender continuing to act as standby counsel. **Id.** at 373. The court also granted Kelly's motion to withdraw his plea. **Id.** Thereafter, the Commonwealth lodged a parole violation detainer, which the trial court approved. **Id.**

Kelly then filed a *pro se* omnibus pre-trial motion claiming that his arrest was illegal because it was based upon an illegal warrant. *Id.* There was no indication in the record as to disposition of this motion, but Kelly then appeared *pro se* for his trial, with the public defender again acting as standby counsel. *Id.* Kelly asked again for the appointment of another attorney; standby counsel indicated that his office could not represent Kelly because of his demands regarding trial strategy, indicating a breakdown in any attorney/client relationship. *Id.* The court granted the motion and appointed new counsel, setting a new trial date. *Id.* at 374. However, one month after his appointment, new counsel petitioned the court to withdraw, stating that Kelly had accused counsel of lying to him, sent counsel letters accusing him of being ineffective, asserted that counsel was working with the Commonwealth, refused to discuss trial strategy, and generally acted unreasonably. *Id.* The trial court conducted a hearing and listened to Kelly's complaints. Thereafter, it stated that it was "out of court-appointed counsel. … You are now at that point where you do not want to cooperate with counsel and you are left with representing yourself…." *Id.* at 375. Trial was then scheduled before a different jurist. Coming back into court for his trial, Kelly had a change of heart and accepted the plea agreement. *Id.* at 376.

Counsel was appointed for Kelly's appeal, and argued that the court erred in finding that Kelly either waived or forfeited his right to counsel. *Id.* at 377. In discerning no error in the conclusion that Kelly's acts supported a finding of forfeiture, this Court held:

- 15 -

> Kelly was a criminal defendant who had been unwilling to cooperate with all three counsel assigned to him; who argued all counsel were incompetent because they refused to argue what he believed was the law; who, the day after his *pro se* motion to withdraw his first guilty plea was granted, filed *pro se* an omnibus pre-trial motion seeking suppression of evidence on a ground the trial court had already addressed (validity of search warrant); who wanted a counsel, but only one who would please him; who treated appointed counsel with disdain; whose trial had been already postponed because he could not agree with assigned counsel (counsel 2); who had been warned by the trial court that failure to cooperate with assigned counsel (counsel 3) would result in him representing himself *pro se* at trial; who sought to have other counsel appointed to him (who would have been counsel 4) and postpone the trial instead of trying to cooperate with counsel 3; and who clearly was not interested in listening closely [to] what Judge Blackwell was telling him, consumed as he was in making his point [that] counsel were ineffective and he knew the law better than assigned counsel. We have no difficulty concluding the trial court did not err in finding Kelly intentionally forfeited his right to counsel.

*Id.* at 381–82.

More recently, this Court considered forfeiture of counsel in ***McClendon***, ***supra***. McClendon and his appointed counsel appeared for his scheduled preliminary hearing, but McClendon refused to proceed because he did not want a public defender to represent him. ***McClendon***, 293 A.3d at 662. The hearing was rescheduled for a date two months later, giving McClendon time to hire counsel, but he appeared at the rescheduled hearing unrepresented. *Id.* When confronted by the court about his lack of legal representation, McClendon complained he did not have enough time to explain his defense to public defender Michael DeJohn, Esquire. *Id.* Attorney DeJohn, who was present, explained to the court that McClendon refused to sign an application for the public defender's office. *Id.* McClendon was then asked to sign a

waiver of counsel form, but he refused, saying it was contrary to his constitutional rights. *Id.* The court declined to continue the preliminary hearing further, and McClendon represented himself *pro se*. *Id.*

McClendon ultimately entered a guilty plea at trial but, on the day scheduled for sentencing, he filed a *pro se* motion to withdraw it. *Id.* While Attorney DeJohn represented McClendon during the plea, he then filed a motion to withdraw his representation. *Id.* The trial court conducted a hearing on both motions, and McClendon claimed that Attorney DeJohn was ineffective. *Id.* The prosecutor objected to delaying McClendon's sentencing, noting that McClendon had used a similar tactic of demanding new counsel to delay the preliminary hearing. *Id.* The court then elected to schedule another hearing to address the motion to withdraw McClendon's plea and to determine whether he would proceed *pro se* or with private counsel. *Id.* At this reconvened hearing, conducted about two weeks later, the trial court found McClendon's arguments frivolous and permitted Attorney DeJohn to withdraw. *Id.* at 668.

The next proceeding was a pre-sentence telephonic hearing because McClendon claimed that he contacted Covid. *Id.* The court asked for documentation of the diagnosis, but McClendon did not have it; at sentencing the next day, McClendon admitted that his test was negative. *Id.* After McClendon was sentenced, he privately retained post-sentence and appellate counsel. *Id.*

On appeal, McClendon maintained, *inter alia*, that the court erred in permitting him to proceed without counsel and that he had not engaged in obstructive and dilatory conduct such that his right to counsel was forfeited. *Id.* at 665. This Court disagreed, finding that McClendon had never cooperated with Attorney DeJohn, he filed motions *pro se* which delayed the proceedings in his case, he indicated that he wanted to retain private counsel but inexplicably did not do so, despite the trial court's warnings that his proceedings would not be delayed again, and then he tried to further delay his sentencing with a false claim of contracting Covid. *Id.* at 668. Moreover, even though McClendon's actions only involved one lawyer, not multiple lawyers like in *Kelly* or *Lucarelli*, "the end result was the same — unnecessarily drawn-out proceedings brought about by a defendant's refusal to cooperate with counsel." *Id.* This Court declared, "Our focus is upon a defendant's conduct and not on the number of counsel that may lead to a forfeiture decision. The duration and persistence of the defendant's dilatory conduct, and the delays occasioned thereby, can lead to forfeiture of counsel even though only one attorney was involved in the case." *Id.* at 669.

Like the appellants in *Lucarelli*, *Kelly*, and *McClendon*, Appellant here engaged in dilatory conduct that unnecessarily delayed the prosecution of his case. Appellant refused to cooperate with Attorney Ulmer from the beginning, calling him ineffective after a pre-trial conference. After a new attorney was appointed to represent Appellant, a jury was picked. When it came to trial preparation, however, Appellant refused to cooperate with his attorney

(Attorney Sullivan) by refusing to meet with him or discuss his case, including any potential trial strategies. Appellant also made "troubling" statements to Attorney Sullivan, which compromised the lawyer's ability to represent Appellant and provides support for the court's grant of Attorney Sullivan's motion to withdraw. The trial court here attempted to understand why Appellant had refused to cooperate with two different attorneys, but Appellant sat silently, looked at the wall, and refused to answer the court's questions. Notably, Appellant never requested additional time to either work with his attorney or find a new one. Nor did Appellant request time to prepare to represent himself *pro se*.

Critically, after attempting to engage with Appellant for some time, the trial court concluded that Appellant's statements that he did not understand the proceedings did not ring true, and that Appellant claimed not to understand only because he did not want to understand. N.T. at 42-43. After the court made this statement, Appellant stopped responding to the court's questions at all. Credibility determinations "are for the trial court to resolve, not our appellate courts." **Commonwealth v. Myers**, 722 A.2d 649, 651-52 (Pa. 1998). After review, we agree with the trial court's assessment of Appellant's actions. Appellant's complaints about his attorneys all surrounded his incorrect understanding of criminal law, and his refusal to accept the attorney's legal conclusions. Appellant clearly attempted to delay his verdict and sentence as long as possible. Appellant's refusal to cooperate with his attorneys, and with the court, has consequences. The consequence here was

that Appellant's dilatory conduct resulted in the forfeiture of his right to counsel. *Lucarelli*, *supra*; *Kelly*, *supra*; *McClendon*, *supra.* There was no error here.

Judgment of sentence affirmed.

Judge McLaughlin joins this memorandum.

President Judge Lazarus concurs in the result.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: <u>11/21/2024</u>